IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

JAMES FRANK REYNOLDS,              *

    Plaintiff,                    *

vs.                                *
                           CASE NO. 4:13-CV-475 (CDL)
WINN-DIXIE RALEIGH, INC.,          *

    Defendant.                    *

_____    *

## O R D E R

Plaintiff James Frank Reynolds ("Reynolds"), a pharmacist, claims that his former employer, Defendant Winn-Dixie Raleigh, Inc. ("Winn-Dixie"): (1) disciplined him more harshly than a female pharmacist, (2) terminated him after he complained about the disparate discipline, and (3) terminated him after he warned that Winn-Dixie was submitting potentially fraudulent claims to Medicaid.  Reynolds brings discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and a retaliation claim under the False Claims Act, 31 U.S.C. § 3730(h).  Presently pending before the Court is Winn-Dixie's summary judgment motion.  (ECF No. 15).  For the reasons set forth below, the Court grants the motion.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to Reynolds, the record reveals the following.

Winn-Dixie hired Reynolds as a pharmacist on February 16, 2012.  During his employment with Winn-Dixie, Reynolds worked with another pharmacist, Georgia Todd.  Todd, who is female, was designated "pharmacy manager."   As manager, Todd's responsibilities included additional administrative tasks such as overseeing the pharmacy inventory, payroll procedure, and customer service.  Reynolds downplays Todd's role as manager, insisting that she "just happened to be the individual

responsible for the overall or general operations of the pharmacy." Reynolds Dep. 235:5-7, ECF No. 15-3. He describes their relationship as that of "partner" and "peer." *Id.* at 235:4. They both reported directly to Chad Brabston, the pharmacy district manager.

## I.   The Missing Xanax

In January 2013, Reynolds discovered that more than 1000 Xanax pills were missing from the pharmacy inventory, and he notified district manager Brabston. Reynolds told Brabston that he believed a pharmacy employee diverted the medicine for personal use. Brabston instructed Reynolds "to only share the results of [his] conclusions with him privately and not with [Todd,] the pharmacy manager." *Id.* at 189:13-15. Reynolds ignored this instruction and informed Todd of the missing medication. Reynolds contends that his reporting the missing medication relates to Winn-Dixie's subsequent decision to terminate his employment and thus gives rise to a retaliation claim under the False Claims Act.

## II.  CJ's Prescription

Reynolds's Title VII discrimination and retaliation claims arise from an incident involving one of his long-time customers, "CJ." CJ received Medicaid, and his coverage was set to expire pending renewal at the end of 2012. On December 30, 2012, the day before his Medicaid coverage expired, CJ had surgery. The

day CJ was discharged from surgery, January 13, 2013, a nurse practitioner wrote CJ a prescription for five medications.

The next day, CJ's sister brought the prescription to the Winn-Dixie pharmacy.  Todd was on duty and determined that CJ's Medicaid coverage expired at the end of 2012, which meant that Medicaid would not pay for the prescribed medications.  Todd informed CJ's sister that she needed to pay cash for the medications.  Unable to afford the payment, CJ's sister left without the medications.

The following day, CJ's sister telephoned Reynolds.  The sister informed Reynolds of her unsuccessful attempt to fill the prescription.  Reynolds believed that Medicaid should pay for the prescribed medications.  He rationalized that it was not "Medicaid's intention to pay for only part of a surgery."  *Id.* at 97:1-2.  Since Medicaid typically covers all medication incidental to surgery, Reynolds concluded that the proper date to put on the prescription was the date of the surgery (December 30, 2012) rather than the date of discharge (January 13, 2013). Reynolds thought that Medicaid would renew CJ's coverage and pay for the prescribed medicine retroactively.

To obtain Medicaid coverage for the prescription, Reynolds called CJ's surgeon, spoke to "someone in authority" at the office, and asked them to send "something that was written" to support dating a prescription for *one of the five* medications,

Lovenox, for December 30, 2012.  *Id.* at 60:4-61:12, 73:1-10.  An unidentified employee at the surgeon's office verbally agreed to prepare a new prescription for Lovenox dated December 30, 2012. As to the other four medications prescribed by the nurse practitioner, Reynolds does not recall requesting a new prescription.

Based on the verbal promise from the surgeon's office but before receiving the revised prescription in writing, Reynolds re-submitted a prescription for Lovenox and Furosemide in the pharmacy computer system and dated it December 30, 2012. Reynolds then submitted claims to Medicaid for Lovenox and Furosemide, also dated December 30, 2012.  Reynolds printed labels for the containers.  The pharmacy did not have Lovenox in stock, so Reynolds ordered additional Lovenox.  As for the other prescribed medications, Reynolds admits that he "dispensed" (i.e. filled the containers with medication) *some* but not *all* of the medications.  *Id.* at 103:2-14.

In an attempt to explain this atypical transaction, Reynolds made a note on the original prescription indicating that the medication was incidental to a surgery performed in December.  He expected the situation to "explain itself" when CJ presented the new prescription dated December 30 at the time of pickup.  *Id.* at 90:7-12.

The following day, CJ's surgeon issued a new prescription for Lovenox dated December 30, 2012, as requested by Reynolds. That same day, CJ's sister came to the Winn-Dixie pharmacy to pick up the medications. When CJ's sister arrived, Todd gave her the Furosemide which had been prepared by Reynolds the previous day. Todd does not recall, but does not deny, putting the recently restocked Lovenox into the container prepared by Reynolds and giving it to CJ's sister. CJ's sister never presented the new prescription, dated December 30, 2012. Todd took no steps to verify the prescription before giving the medication to CJ's sister.

## III. The Aftermath of CJ's Prescription

Two days after giving CJ's sister the medication, Todd sent an email to Brabston expressing concern about Reynolds's decision to backdate CJ's prescriptions. In response to the email, Brabston notified three of his superiors: Bill Bandy, the director of pharmacy operations; B.J. Cobb, the pharmacy professional services manager; and John Fegan, the vice president of the pharmacy. They directed Brabston to inform Reynolds that Winn-Dixie was suspending his employment pending further investigation. Brabston was also instructed to obtain an explanation from Reynolds of the events surrounding CJ's prescription.

A.   Reynolds Complains about Potential False Claims

Before receiving news of his suspension, Reynolds had conversations with Todd and a pharmacy tech about the potential illegality of Winn-Dixie's "partial fill" policy.   Reynolds claims he informed Todd that Winn-Dixie's partial fill policy was "not really federally compliant."   *Id.* at 139:1-3.   And Reynolds further contends that Todd's conduct was even less compliant with federal regulations than what was permitted by the flawed policy.

Reynolds also contends that he "counseled" Todd about her practice of charging government healthcare providers, such as Medicaid, the full cost for medications when those medications were available to the public at a reduced cost using a Winn-Dixie discount card.   Reynolds alleges that this practice violates O.C.G.A. § 26-4-145, which he contends requires Winn-Dixie to account for the Winn-Dixie discount when submitting claims to government healthcare providers.   Specifically, Reynolds claims that on January 18 and 23, 2013, he informed Todd that he reversed a claim she submitted to a state employee's healthcare provider for $20, when the medication was available to the public for $4 with the Winn-Dixie discount card.

7

B.   Reynolds is Suspended

On January 24, 2013, the day after Reynolds complained to Todd about overcharging government healthcare accounts, Brabston, with Todd present, informed Reynolds that Winn-Dixie was suspending him pending investigation of the events surrounding CJ's prescription.   Reynolds claims that Brabston exhibited a "negative demeanor" and refused to believe him when he told Brabston that he obtained a new prescription, dated December 30, 2012, from the surgeon.   Brabston contends that he asked Reynolds to "write a statement."   Brabston Dep. 57:24-25, ECF No. 15-10.   But Reynolds maintains that Brabston "handed [him] pen and paper and directed [him] to write a note saying that [he] backdated the prescription for CJ by adjudicating it with Medicaid for the December 30, 2012 service date."   Reynolds Aff. ¶ 47, ECF No. 19-1.   Reynolds refused to write the statement requested by Brabston.   Instead, he later prepared a typewritten statement and gave it to Brabston.

During his suspension, Reynolds submitted additional written statements detailing his actions regarding CJ's prescriptions.   Additionally, Reynolds provided Bandy, Cobb, and Fegan with a copy of the new prescription dated December 30, 2012.

Reynolds also complained to Brabston that Todd was "more culpable" than Reynolds but was not suspended and that Brabston

had favored Todd over Reynolds throughout his employment. Compl. ¶ 18, ECF No. 1. Reynolds acknowledges, however, that until his suspension Brabston's alleged favoritism caused him no harm.

C.   Reynolds is Terminated

Brabston contends that on January 28, 2013, Bandy, Cobb, and Fegan, informed him of their decision to terminate Reynolds. Brabston subsequently terminated Reynolds. Reynolds maintains that the decisionmakers actually decided to terminate him on January 25, 2013. Reynolds Aff. Ex. F, Email from BJ Cobb to Chad Brabston (Jan. 25, 2013). In contrast to Reynolds's termination, the only discipline Todd received was verbal coaching from Brabston on the importance of double-checking prescriptions.

Reynolds had no direct communication with Bandy, Cobb, or Fegan, except for three statements he emailed them on January 28, 2013 regarding CJ's prescription.

DISCUSSION

Reynolds asserts three claims against Winn-Dixie. He alleges two claims under Title VII, contending that Winn-Dixie terminated him because of his gender or, alternatively, because he complained of gender discrimination. Reynolds alleges a third claim under the False Claims Act, arguing that Winn-Dixie violated the Act when it terminated him in retaliation for

9

warning Winn-Dixie that it submitted false claims to the government. The Court considers each of Reynolds's claims in turn.

## I.   Title VII Gender Discrimination Claim

An employer may not "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).   Reynolds claims that Winn-Dixie discriminated against him based on his sex when it disciplined him more harshly than his female colleague, Todd.

Reynolds does not point to any direct evidence of gender discrimination. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1085 (11th Cir. 2004).   Instead, he relies on circumstantial evidence.   Therefore, the Court analyzes Winn-Dixie's summary judgment motion under the familiar three-step framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).   To avoid summary judgment, Reynolds must first establish a prima facie case of discrimination. *Springer v. Convergys Customer Mgmt. Grp. Inc.,* 509 F.3d 1344, 1347 (11th Cir. 2007) (per curiam).   If he establishes a prima facie case, then the burden shifts to Winn-Dixie to articulate a legitimate, non-discriminatory reason for

the employment action. *Id.* If Winn-Dixie articulates a legitimate, non-discriminatory reason for its action, then the burden shifts back to Reynolds to point to evidence sufficient to create a genuine factual dispute as to whether Winn-Dixie's proffered reason is a mere pretext for discrimination. *Id.*

To establish a prima facie case of disparate discipline, generally a plaintiff must show that: "(1) []he is a member of a protected class; (2) []he was subjected to adverse employment action; (3) h[is] employer treated similarly situated [female] employees more favorably; and (4) []he was qualified to do the job." *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008) (internal quotation marks omitted). A plaintiff can also satisfy the third prong by showing that he was replaced by someone outside of his protected class. *Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

The parties here dispute only the third element of the prima facie case. Because a male pharmacist replaced Reynolds, he can only satisfy this third element by demonstrating that he was treated less favorably than similarly situated female employees. "[T]o determine whether employees are similarly situated, we evaluate 'whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'" *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d

1319, 1323 (11th Cir. 2006) (per curiam) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)).  "[T]he quantity and quality of the comparator's misconduct [must] be *nearly identical* to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia*, 171 F.3d at 1369 (emphasis added); *accord McCann*, 526 F.3d at 1373-75.

Reynolds points to Todd as his comparator.  He argues that he changed the date on a prescription submitted to Medicaid before receiving a written prescription to support the changed date and that Todd dispensed the backdated prescription to CJ's sister.  Reynolds maintains that Todd, as the dispensing pharmacist, had a duty to verify the prescription before giving the medication to the customer.  Reynolds contends that Todd was negligent because she failed to do so.  And yet, Winn-Dixie merely counseled Todd but terminated Reynolds.

Winn-Dixie responds that Reynolds and Todd are not similarly situated because Reynolds's conduct was intentional, while Todd's was negligent.  Winn-Dixie argues that Reynolds intentionally submitted backdated prescriptions with the intent that Medicaid would pay for the prescriptions.  Winn-Dixie claims that it was questionable for Reynolds to backdate the Lovenox prescription, even though the surgeon's office verbally promised to write a new prescription.  And as to the Furosemide,

Winn-Dixie argues that Reynolds "admittedly submitted a false claim to Medicaid" because he backdated the prescription without ever requesting or receiving an updated prescription. Br. in Supp. of Mot. for Summ. J. 4, ECF No. 15. Comparatively, Todd did not engage in intentional wrongful conduct. Winn-Dixie argues that even if Todd was negligent by failing to verify the prescription before giving the medications to CJ's sister, her negligence is far different from Reynolds's intentional misconduct. Winn-Dixie maintains that it should have the right to distinguish between these types of conduct and determine which to treat more harshly.

The Court agrees with Winn-Dixie and finds that Reynolds and Todd are not similarly situated. Reynolds entered a prescription dated December 30, 2012, into the pharmacy computer, submitted a claim for payment to Medicaid, and created a label for the medicine containers. Thus, the record is clear that Reynolds was the pharmacist that originated the order sequence for the medication. The record is also clear that Todd simply dispensed the medicine: she gave the Furosemide to CJ's sister, and she filled the Lovenox container using the label Reynolds created. As the pharmacist originating the order, Reynolds arguably is responsible for the provision of the drug to the public. Todd's involvement as the dispenser of the drug

13

was of a different character.  Reynolds and Todd clearly engaged in different conduct regarding this transaction.

Additionally, Winn-Dixie asserts, and Reynolds does not dispute, that once a pharmacist at Winn-Dixie creates a label, the pharmacist that later fills the medication using that label need take fewer steps to verify the prescription.  Because the pharmacist that originated the label has already confirmed the information and verified the accuracy of the prescription, the pharmacist dispensing the medication does not need to be as diligent in re-verifying the prescription.  Although Winn-Dixie acknowledges that Todd should have double-checked the date on the prescription, it was not unreasonable for Winn-Dixie to treat her omission more leniently than Reynolds's misconduct.

Reynolds and Todd are not similarly situated.  The facts viewed in the light most favorable to Reynolds reveal that Reynolds and Todd engaged in "[d]ifferent types and degrees of misconduct," which "may warrant different types and degrees of discipline."  *Burke-Fowler*, 447 F.3d at 1325.  Accordingly, Reynolds fails to establish a prima facie case of gender discrimination, and Winn-Dixie is entitled to summary judgment on Reynolds's Title VII gender discrimination claim.[1]

---

[1]  The Court also rejects Reynolds's alternative argument that, even absent a similarly situated comparator, sufficient evidence exists to create a genuine factual dispute as to gender discrimination. Reynolds points to conduct by Brabston suggesting that Brabston had discriminatory animus, but Reynolds fails to overcome the undisputed

## II.  Title VII Retaliation Claim

Reynolds also alleges that Winn-Dixie terminated him in retaliation for complaining about gender discrimination.  It is unlawful for an employer to terminate an employee "because he has opposed any practice made an unlawful employment practice" by Title VII.  42 U.S.C. § 2000e-3(a).  Reynolds claims that during his suspension, he informed Brabston that he believed Winn-Dixie was punishing him more harshly than Todd, his female colleague.  Shortly thereafter, Winn-Dixie terminated Reynolds.

Since Reynolds relies on circumstantial evidence in support of his retaliation claim, the Court analyzes that claim using the burden-shifting framework of *McDonnell Douglas Corp.*, 411 U.S. at 802-05.  "A *prima facie* case of retaliation under Title VII requires the plaintiff to show that: (1) []he engaged in an activity protected under Title VII; (2) []he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).  "After the plaintiff has established the elements of a claim, the employer has an opportunity to articulate a legitimate, nonretaliatory reason for the challenged employment action as an

---

fact that Brabston was not the final decisionmaker in Reynolds's termination.  Moreover, the record is devoid of any evidence suggesting that Brabston used the decisionmakers as an instrument to have Reynolds terminated because of his gender.  Thus, this is not a dispute where cat's paw theory applies.  *See Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998).

affirmative defense to liability." *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008). Finally, if the employer articulates a legitimate, nonretaliatory reason, the plaintiff must prove that the employer's proffered reason is a pretext for unlawful retaliation. *Id.*

The parties here do not dispute the first two prongs of the prima facie case: Reynolds complained about gender discrimination and Winn-Dixie terminated him. The only issue is whether a causal link exists between these two events. To prove causation, Reynolds must show that his protected activity was the "but-for" cause of Winn-Dixie's decision to terminate him, not just a motivating factor. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).[2] At the summary judgment stage, Reynolds must point to sufficient evidence to create a genuine factual dispute as to causation.

Winn-Dixie argues that there is no causal connection between Reynolds's protected activity and his termination because Reynolds only complained about gender discrimination to Brabston. There is no evidence that Reynolds complained to the decisionmakers or that Brabston relayed Reynolds's complaints to the decisionmakers. Thus, the decisionmakers were unaware of

---

[2] The Court notes that Reynolds's briefing relies on an outdated standard for causation. Although earlier cases provided a relaxed standard, the United States Supreme Court has since clarified that a plaintiff must prove "that the desire to retaliate was the but-for cause" of termination. *Nassar*, 133 S. Ct. at 2528.

Reynolds's protected activity when they decided to terminate him.   In response, Reynolds suggests that it can establish causation using the theory of cat's paw.

Under cat's paw theory, an employer can be held liable for the discriminatory acts of a supervisor who is not a final decisionmaker if the "supervisor performs an act motivated by [gender] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action."   *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011).   But the present record is devoid of evidence sufficient to create a genuine factual dispute as to cat's paw liability.   There is simply no evidence suggesting that Brabston somehow used the decisionmakers as an instrument to have Reynolds terminated in retaliation for his complaints. The Court thus finds that Reynolds failed to demonstrate that his protected activity was the but-for cause of his termination. *See Dent v. Ga. Power Co.*, 522 F. App'x 560, 563 (11th Cir. 2013) (per curiam) (finding no causation when the decisionmakers were not aware of the plaintiff's protected activity when they decided to terminate him).   Accordingly, Winn-Dixie is entitled to summary judgment on Reynolds's Title VII retaliation claim.

## III. False Claims Act Retaliation Claim

Reynolds also contends that his termination violates the False Claims Act ("Act").   31 U.S.C. § 3730(h)(1).   The Act

prohibits an employer from discharging an employee because he engaged in "whistleblowing":

> Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged . . . because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

*Id.*

The thrust of Reynolds's claim is that he warned Winn-Dixie that it submitted potentially fraudulent claims to Medicaid and as a result, Winn-Dixie terminated him.

### A.   Prima Facie Case of Retaliation

To establish a prima facie case of retaliation, Reynolds must establish that: (1) Winn-Dixie is covered by the act, (2) Reynolds engaged in protected conduct, (3) Reynolds experienced adverse employment action, and (4) the adverse employment action is causally connected to Reynolds's protected conduct. *United States ex rel. Parato v. Unadilla Health Care Ctr., Inc.*, 787 F. Supp. 2d 1329, 1341 (M.D. Ga. 2011); *accord Mack v. Augusta-Richmond Cnty., Ga.*, 148 F. App'x 894, 896-97 (11th Cir. 2005) (per curiam). It is undisputed that Reynolds satisfies elements (1) and (3). Winn-Dixie contends that Reynolds did not engage in protected activity and that there is no causal connection between such activity and Winn-Dixie's decision to terminate him.

1.   *Protected Activity*

A plaintiff engages in protected activity under the Act if there is "at least 'a distinct possibility' of litigation under the False Claims Act at the time of the employee's action." *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1303 (11th Cir. 2010) (per curiam) (quoting *Childree v. UAP/GA AG Chem., Inc.*, 92 F.3d 1140, 1146 (11th Cir. 1996)).  Reynolds alleges that he engaged in protected activity on three separate occasions.

First, he reported to Brabston that more than 1000 Xanax pills were missing from the pharmacy's inventory.  Although Brabston may have had some legal obligation to report the missing pills to the government, it is undisputed that Winn-Dixie did not submit a claim to the government related to the Xanax.  An employer does not incur liability under the Act for "disregard of government regulations or failure to maintain proper internal policies." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) (per curiam).  Rather, "[l]iability under the False Claims Act arises from the submission of a fraudulent claim to the government." *Id*.  Since Winn-Dixie did not submit a false claim to the government related to the Xanax, Winn-Dixie did not violate the Act and no reasonable possibility of litigation under the Act existed.  Therefore, Reynolds's

communication regarding the Xanax is not protected activity for purposes of a False Claims Act retaliation claim.

In addition to the Xanax incident, Reynolds alleges that he engaged in protected activity when he informed Winn-Dixie that its practice of billing Medicaid the full amount for prescriptions available at a lower price with a store discount card violated federal law. Specifically, Reynolds contends that on January 18 and 23, 2013, Reynolds informed Todd that he reversed a claim Todd submitted to a state employee's healthcare provider for $20, when the medication was available to the public for $4 using the Winn-Dixie discount card.

Reynolds also claims that he informed Todd that Winn-Dixie's "partial fill" policy did not comply with federal law. "Partial fill" refers to the practice of charging an insurance provider for the full amount of a prescription, even though the pharmacy has a less-than-needed amount of medicine in stock. In these situations, the pharmacist immediately gives the patient whatever medication is available. Then after the pharmacy is re-stocked, the pharmacist dispenses the remainder of the medication to the patient. This practice can result in submission of false claims to government healthcare accounts if a pharmacist forgets, or for other reasons fails, to give the patient the entire prescription. Reynolds informed Todd that most pharmacies have a policy against partially filling

prescriptions and advised her against billing government healthcare accounts before dispensing the entire prescription.

The Court finds that, for purposes of summary judgment, Reynolds has created a genuine factual dispute as to whether his conversations with Todd regarding Winn-Dixie's partial fill policy and overcharging Medicaid for prescriptions constitute protected activity. For both of these issues, Reynolds warned that the practices violated the law and suggested that the pharmacy was submitting false claims to Medicaid. While Reynolds later testified that "it was not yet . . . necessary to accuse [Winn-Dixie] of false claims," Todd could have reasonably feared that Reynolds would report the potentially fraudulent conduct to the government. Reynolds Dep. 220:24-221:1. Thus, Reynolds engaged in protected activity under the Act.

### 2.  Causation

To establish causation a plaintiff must prove that the decisionmaker was aware—at the time the adverse employment action occurred—that the protected activity took place. *See* *Mack*, 148 F. App'x at 897 (finding that an employee's discharge did not violate the Act because the decisionmakers were not on notice of the employee's protected activity at the time he was terminated). Here, the record is totally devoid of any evidence suggesting that the decisionmakers at Winn-Dixie—Bandy, Cobb, or Fegan—knew of Reynolds's protected activity. Reynolds spoke

only to Todd and a pharmacy tech about his concerns.  Reynolds does not point to, and the record does not contain, any evidence suggesting that Todd or the pharmacy tech informed the decisionmakers of Reynolds's protected activity.

Instead, Reynolds apparently contends that Todd was a decisionmaker responsible for his termination.  This argument, however, contradicts Reynolds's consistent position that Todd was his partner and peer.  Reynolds expressly stated in his affidavit: "I did not report to her."  Reynolds Aff. ¶ 4. Moreover, no evidence exists in the present record that Todd was involved in the decision-making process with Bandy, Cobb, and Fegan.

Reynolds has failed to point to any evidence showing a connection between Reynolds's protected activity and Winn-Dixie's decision to terminate him.  Accordingly, Winn-Dixie is entitled to summary judgment on Reynolds's False Claims Act retaliation claim.

## IV.  Conclusion

For the above stated reasons, the Court grants Winn-Dixie's motion for summary judgment as to each of Reynolds's claims. IT IS SO ORDERED, this 9th day of January 2015.

                              S/Clay D. Land
                              _____
                                   CLAY D. LAND
                           CHIEF U.S. DISTRICT COURT JUDGE
                              MIDDLE DISTRICT OF GEORGIA